That brings us to Robertson v. Riverstone Communities, LLC. And we will begin by hearing from Ms. Brown. Good morning. May it please the court, my name is Christine Brown, appearing for the Plaintiff, Rose Robertson. This appeal involves two distinct issues. A question of whether a plaintiff presented sufficient evidence to create a genuine issue of material fact as to whether race was a motivating factor in her termination. And with regard to the FMLA, a question of whether the court properly considered defendants' argument that Ms. Robertson was not an eligible employee when its answer admitted that she was. As to race discrimination, As we know, the ultimate question at summary judgment in a race discrimination case is whether a reasonable jury could find that race was a motivating factor in the adverse action. Plaintiff Robertson submits that a reasonable jury could most certainly find that race was a motivating factor in defendants' termination of her. Plaintiff contends that she should have survived summary judgment under the direct evidence analysis and the circumstantial evidence analysis. And submits that the district court erred in finding that the plaintiff did not survive summary judgment under either of these evidentiary models. With regard to direct evidence, the comments in this case were made by Renee Scott, a decision maker in Ms. Robertson's write-ups and termination. Ms. Robertson was a property manager of two of defendants' properties in Georgia when she was awarded property manager of the year in 2014. At that ceremony, Ms. Scott, who was not her supervisor at the time, told Ms. Robertson that she only won because she was black. The testimony in this case from former regional manager Shannon Smith is that during her employment with Riverstone, she asked Ms. Scott to accept a position in Atlanta. And Ms. Scott refused, stating that she did not want to work in Atlanta because there's too many F-ing N-words in Atlanta, I'm not going there. And as the court is aware, the record reflects the actual words that were used. Ms. Smith further testified that on multiple occasions, Ms. Scott stated that she hated N-words. Ms. Smith heard Ms. Scott use the N-word 20-plus times between May of 2012 and March of 2014. This was not a one-off comment, but instead consistent, loathsome, and undeniably racist comments. And plaintiff submits that these comments are direct evidence of discrimination. The district court disagreed, finding that Ms. Scott's remarks are not direct evidence of discrimination because they are remote in time from and not directed at the employment decisions that plaintiff challenges, thereby requiring inference or presumption. As to timing, Ms. Scott had no opportunity to take action against Ms. Robertson until she became her supervisor in May of 2015. Thus, this was her first... She began retaliating at her first... Not retaliating, she began discriminating at her first opportunity to do so. The setup for termination began within a week as Ms. Scott immediately emailed Ms. Robertson, quote-unquote, expectations and noted that failure to improve within three months would subject her to disciplinary action. As it happens, Ms. Scott waited less than a month to issue Ms. Robertson her first write-up. And she terminated her in less than three months. Numerous cases in this circuit have found that comments made with less temporal proximity than we have here were direct evidence. In Lindsay v. American Cast Iron Pipe Company, the comments were approximately a year and a half before the plaintiff was denied a promotion. We have longer time periods in Buckley v. Hospital Corps of America, in Bell v. Crack and Good Bakers, Inc., and in Miles v. MNC Corp. And all of those cases are cited in the reply brief and they are compiled in Wheat v. Rogers and Willard, Inc. Thus, as to the timing of the comments, Ms. Robertson asserts that the timing does not prevent the comments from being considered direct evidence. Now, with regard to the relationship between the comments and the employment decision, plaintiff submits that in a case such as this one, one simply cannot divorce the racist attitude of the decision-maker from the employment decision at issue in this case. Ms. Scott affirmatively stated she did not want to be around Black people, that she hated Black people, and she repeatedly called Black people the N-word. Ms. Scott's comments evidence that she does not view the world normally. She is effectively viewing things through a dirty camera lens. Why then would one particular decision involving a Black person be clear of that dirty lens? There is no evidence that she cleaned the lens for this particular circumstance. Now, the Wright v. Southland case, which is cited in the briefing, analyzed many decisions in finding that direct evidence was appropriate in that case. And the court looked at two different definitions of direct evidence, the dictionary definition and the preponderance definition. A review of the cases that Wright discusses and the cases cited in Merritt v. Dillard Paper Company show that often the definition of direct evidence was not highly analyzed by the court. And thus, what Wright really looked at was an analysis of the decision made rather than the definition used or the standards used for direct evidence in those decisions. In that regard, like Buckley v. Hospital, the standard for direct evidence was not discussed. Same with Bell v. Crack and Good Bakers, Inc. But in terms of the discriminatory animus that is evidenced by Ms. Scott's comments, Shannon Smith's testimony relates to this point about the employment decisions in this case. She was asked, do you believe that Renee Scott was out to get Rose Robertson? Counsel? Yes. I'm sorry for interrupting. This is Charlton Rosenbaum. Let me ask you, though, what do you make of the fact that there were three other people who were involved in the termination decision? And with respect to the disciplinary actions, there were also other people involved. How do you deal with that? Well, Judge Rosenbaum, I believe that the law in this circuit is clear that you cannot have a decision-maker who is using discriminatory bias in the decision-making process. And in this particular case… Two minutes remaining. I think it's clear that Ms. Scott was driving this bus, and she had particular influence over the other higher-up approvers of the actions because she's not only had friendly relationships with them, there's evidence from Ms. Smith of a sexual relationship with one of them. So it's not just even in this case that she played a role. She played the substantial role in having these… in the termination and in the write-ups prior to that. Other people signed off on it, but she was the instigator. This is Judge Anderson asking a question. Is there any dispute with respect to the company's stated allegedly legitimate reason for the firing? In other words, is there any dispute about the fact that she, the plaintiff, was behind with accounts receivable and did and was behind with respect to the vacancies and so forth and the problem that those were increasing under her watch? And also related to that, with respect to the problems of opening the pool, keeping it open, addressing the fire code violations and other things of that nature. Yes, Your Honors. Let me begin with what was included in the termination notice because the evidence in the record is that defendants… or defendant did not claim any other reasons for the termination. And so we do dispute, yes, that those were the reasons for discharge, not factually disputing the numbers that were included on the termination notice, but disputing that that was the reason for discharge when you look at the fact that her when she won property manager of the year. Additionally, with regard to the pool, she opened both pools in 2015, which was the first time both pools had been open. She didn't get written up about the pool in 2013 when it wasn't opened by Memorial Day and when only one pool opened. So we think a jury could certainly disbelieve that those were legitimate reasons for termination. And as to the previous write-ups, Ms. Robertson did testify that there were things included… Counsel, I'm sorry to interrupt. This is Robin Rosenbaum again. I take your point with respect to why you believe that this might have been pretextual. But let me just ask you something just in terms of policy. Does that mean that a company is stuck with whatever standards it had in earlier years going forward? In other words, since it didn't open both pools in 2013, it would never have to open both pools after that, because if it did, then that must be a pretextual reason for the discharge. Or how do we address that, I guess, is what I'm asking. Thank you, Your Honor. I think, no, a company is not stuck. In this instance, what changed was Renee Scott came into the equation. So would we be looking at a different policy stated in 2015 and 2013? We'd be looking at a different circumstance. But Renee Scott came into play, and within three months, my client was terminated with the expectations and threats of discipline beginning within the first week of when she appeared on the court. Do I have some time remaining? No, your time has expired. Thank you. All right. Thank you, counsel. So you have reserved four minutes for rebuttal, and we will hear from attorney Midden. I hope I'm pronouncing that correctly. If not, please let me know the correct pronunciation. Thank you, Your Honor. May it please the court. This is Adriana Medense on behalf of the Apelli Riverstone Community. I'll talk first about this question of direct evidence. What is the appropriate standard, and then did the appellant have it here? As noted in the briefing, the majority of decisions on the question of what is direct evidence follow the standard that was set forth by this court in Standard B, ABLE Services, which is evidence that establishes the existence of a discriminatory intent behind the employment decision without any inference or presumption. And here on appeal, the appellant is arguing that the more appropriate standard is what was set forth in Wright v. Southland Corporation, which is evidence from which a reasonable trier of theft could find, more probably than not, a causal link between the adverse action and the protected personal characteristic. The precedential value of these decisions is argued in the brief, and I will just note here that while we certainly acknowledge that Wright has never been explicitly overturned, it does not appear to have been followed by this court or district courts really since, and on any sort of a consistent basis. But it's important to note that even if the standard set forth in Wright v. Southland Corp. is the appropriate standard, the district court considered it and correctly found that the appellant did not have evidence that would meet that standard. And when you look at what... Yes, ma'am? Counsel, sorry to interrupt. This is Robin Rosenbaum, and thank you for giving me the correct pronunciation. Madensi, right? Is that right? Yes. Yes. Let me ask you this, Madensi. Something concerns me about this case, and that is that while we've talked about direct evidence generally having to bear on the decision, it has to be a comment or whatever in relation to the decision, I think it's hard to argue with Ms. Brown's proposition, which is if somebody repeatedly and consistently... And I recognize that Ms. Scott contests this, but as you know, we must accept the evidence in the record for purposes of summary judgment here. We must accept the evidence in the light most favorable to the non-moving party. And so if somebody repeatedly uses terms like the N-word to describe others, and it's a consistent feature of her speech and her attitude, then why should we not take into account that it would have polluted and affected any kind of other decisions she would have made? Why is that the case? Well, Your Honor, the claim here is... Our position is not that these alleged comments, and I appreciate you noting that, yes, Ms. Scott does vehemently deny making them, but we will assume that the allegations are true for the purposes of today. The relevant question is not, you know, do those comments mean that Ms. Scott is a racist? The relevant inquiry is, did those racist beliefs, alleged racist beliefs, bleed into her employment decisions that she may or may not have... That she was responsible for in this particular case? And I guess that's the question. How, from a common sense standpoint, could we come to the conclusion that assuming a person is so racist that they consistently and constantly use the N-word and otherwise reflect a racist attitude, that that racist attitude did not affect their employment decisions? I'm sorry. Counsel? Hello? I'm having trouble hearing. Decision-maker. Counsel? Can you hear me? I can hear you now. Were you able to hear my question? Hello? Okay. Counsel? I was. And my response to that was that it... Can you hear me? I'm sorry, Counsel. You keep dropping out. Do you want to try one more time? Can you hear me now? Yes, we can hear you now. Okay. That's 20-20 for you. I've never had a problem with the connection until today. Okay. My response to Your Honor's question was that the standard, even the standard that is articulated in Wright, is that the statement itself must connect the discriminatory attitude to the employment decision at issue. The standard in no case cited in any brief anywhere is that if an alleged decision-maker has ever made a racist comment, then that automatically means there is direct evidence. It is certainly relevant to the question of, you know, to the circumstantial evidence analysis. I absolutely agree that it is appropriately introduced there. But direct evidence under any standard, whether you're looking at the Wright case or the Able Services case, requires the statement itself to connect the racism or whatever the discriminatory attitude is to the decision in question. Because it is possible that people who espouse discriminatory views may know better than to practice those in the workplace in which they work. And so that's why we have two different standards. Yes, ma'am. Counsel, may I ask you a question that relates to the FMLA issue instead? Yes. The district court determined that the issue that you admitted in the answer that she was, in fact, an employee for purposes of the FMLA was a legal conclusion. That's correct, right? Yes. I guess my question is, and this is my concern, is why would a defendant ever file a motion to dismiss if it knew that it could just admit a legal conclusion in a complaint, and then those admissions could be disregarded at summary judgment? I'm sorry, Your Honor. Could you repeat your question? Well, you agree that most of the times, if the statute does not apply to an employer, you file a motion to dismiss, correct? Yes, correct. You could. Okay. So why would then a defendant ever file a motion to dismiss if they could just admit something as a legal conclusion, and then after discovery has closed, then ask the trial court to disregard the admission since it's a legal conclusion? Does this not put the plaintiff in a prejudicial position because now you've admitted something, and they took no discovery in order to in fact true? Well, I do want to, well, I'll speak to both points, which is I do think that the district court considered and considered heavily the fact that the mistaken admission in our answer was not done to secure any sort of benefit in this case. The evidence is undisputed that it was, that there was no malintent on the part of Riverstone when it mistakenly made this and it also considered to your honor's second point, this question of whether the appellant was in fact prejudiced. She did conduct discovery on this issue. This fact came out in a deposition in which she was afforded the opportunity to ask questions of that witness and did so regarding the appropriate number of employees. And so there was discovery done. The record is also undisputed that that deposition occurred more than two months before discovery closed in this case. And so she had two months to conduct discovery on this specific issue and she chose not to. The record is undisputed that we offered to extend discovery so she could conduct discovery on this specific issue. She chose not to. We voluntarily produced an employee report on the issue of the issue. Appellant turned us down. And so the position that I would take is that sort of gamesmanship that the court is concerned with where a defendant might admit something and then withdraw it later. That's actually the behavior that the appellant has displayed here because essentially when this fact came out two months before the close of discovery, Riverstone did everything it could to address it and allow her to conduct discovery. And the response was simply, I'm too busy to do that. You're stuck with what's in your answer. Gotcha. And that is not, as the district court found, a reason to, that's not a just result. Essentially that given what happened here, that we did not sandbag the appellant. This is not, for example, a situation where we admitted something and then submitted an affidavit in support of our motion for summary judgment where the issue had never been addressed. There were multiple opportunities for discovery on this particular issue. This is Judge Anderson talking. I want to take you back to the repeated consistent racist statements. They are, as you acknowledge, circumstantial evidence. Why doesn't, if these statements are as pervasive as your opponent suggesting in the argument this morning, and if there is any dispute at all about the legitimate reasons that the company put forward for the termination decision, why doesn't this you know, an unrelated racist statement is simply not enough to survive summary judgment? Well, I think if, you know, we certainly take the position that the statements are relevant to a circumstantial analysis. And in this case, appellant has, you know, essentially conceded that she doesn't have comparator evidence such that she cannot proceed under the traditional McDonnell Douglas prima facie case. And she's proceeding under the mosaic theory. The problem with her theory is that she is only presenting the court with a handful of tiles from the mosaic that ignore the vast majority of the record in this case. And I want to address in particular why the comments of the alleged comments of Ms. Scott are not the slam dunk that they are portrayed to be. Appellant has consistently in this case oversold the role that Ms. Scott played in these write-ups and in this termination. To begin with, there is no dispute. While appellant does dispute that her AR and occupancy were the reason for her termination, she points to discrimination, she doesn't dispute that she was not hitting AR goals. She doesn't dispute that she was not hitting occupancy goals. And there were obviously other issues with the property, but those are based on objective metrics that she was not meeting her goals. Those performance issues are documented in the month before Ms. Scott ever became her supervisor. This isn't an employee who was a superstar and then had her downfall once Ms. Scott became a supervisor. She received a performance evaluation from Ms. Laughlibine documenting the problems with AR and occupancy. Two minutes remaining. Thank you. And she was demoted shortly before Ms. Scott became her supervisor. So again, these performance issues existed long before Ms. Scott became the supervisor. So that Ms. Scott then followed up with her a week after she became the supervisor to say AR and occupancy need to turn around is not as nefarious as it seems because appellant had been hearing this from Ms. Laughlibine, who she admits is not a racist, for months. As for the termination, it's very important to note that Ms. Scott, yes, she was involved. She was the lowest rung on this ladder by far. Shortly before the termination, the HR director, Hillary Snyder, and the senior regional manager, Ms. Laughlibine, whom plaintiff admits is not a race, neither one of them are racist, physically visited the property and found it to be in such disarray that it was Ms. Snyder who emailed a group consisting of Ms. Laughlibine, Ms. Scott, and Ms. Ryuda, the chief operating officer, and said, I think it's time we move for termination of Rose. It was not as alleged by the appellant, Ms. Scott, who was the driver of the bus, it was Ms. Snyder. Ms. Snyder said it's time to move for termination. Ms. Laughlibine agreed. Ms. Ryuda agreed. Again, that is the HR director, that is Ms. Scott's supervisor, and Ms. Scott's supervisor's supervisor. All three of these women testified. They never heard Scott say a single derogatory thing about African-Americans, never heard her use the N-word. There is simply no evidence that any of these women was influenced in any way by Ms. Scott. They all testified that they based their decision on their own physical observations of the property, because they were there, and on things like AR numbers, which are undisputed, they don't lie, and occupancy numbers. Again, undisputed, they don't lie. Thank you. For all of these reasons, Your Honor, we would ask that the court affirm the decision of the district court. Thank you, counsel. That brings us back to Ms. Brown. You have four minutes of rebuttal time. Thank you, Your Honor. I would like to start by saying that this area manager issue is a red herring. Indeed, Ms. Robertson was a star as a property manager, not only evidenced by the fact that she got property manager of the year for her performance in 2013, but on her evaluation in December of 2014, with regard to her property management, this is when she was serving in both roles, which no one else was doing in the company at the time, which is in the record in our brief. Ms. Offelbein wrote, as a property manager, you are a rock star, all caps. So she was a star as a property manager, and them having her serving in dual roles for a limited period of time, which she positioned she was happy to leave and go back to being a property manager, is simply a red herring in the direct evidence. I think our overwhelming point here is, regardless of the definition used of the two set forth in Wright, we contend that these statements are tied to the employment decision here. They cannot be divorced from it, and thus they are direct evidence. But at the very least, they are strong evidence, circumstantial evidence of discriminatory intent, and a jury could certainly find that Ms. Scott's racist attitudes influenced the decision-making process here. She's the direct supervisor. She's the one raising these issues, instituting the write-ups, and there's plenty of evidence in the facts about how the other women were approvers of these things. In fact, the form itself for write-ups indicates verbal first, second, third, and final write-ups. Ms. Robertson only got through second write-up before she was terminated. The other circumstantial evidence we have here were the write-ups that Ms. Robertson wanted to give to two maintenance workers, one white and one black, for failing to timely complete maintenance tasks. The one for the white worker was not by Ms. Laufelbein that she and Ms. Scott spoke and determined he would not be given one because he was a quote-unquote good guy. Also, none of the white... Counselor, doesn't the record reflect with respect to that particular write-up, though, that Ms. Scott had gone ahead and written him up and Ms. Laufelbein was the one, for whatever reason, who decided not to give the write-up? Well, my recollection of that, Your Honor, is that my client presented it and that it went through the ranks. And so, as I understood the record, after it went through the ranks, that Ms. Laufelbein followed up with my client by saying she spoke with Ms. Scott and that the decision was made not to give him a write-up. Um, I'm sorry. I did also want to comment briefly on the issue about the admission and the answer and... Counselor, your time has expired. I will rely on the briefs in that regard then, Your Honor. Thank you very much, Counsel. All righty. We will take the cases under advisement and we will adjourn for the day. Have a great weekend. Thank you.